UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

BILWIN DEVELOPMENT AFFILIATES LLC,

                                          Plaintiff,

                vs.

REVLON CONSUMER PRODUCTS CORPORATION and
REVLON, INC.,

                                      Defendants.
_____

**COMPLAINT**

Civil Action No.: 7:20-cv-3092

**TRIAL BY JURY DEMANDED**

       Plaintiff Bilwin Development Affiliates LLC ("Plaintiff" or "Bilwin"), by its attorneys, **KNAUF SHAW LLP**, for its Complaint, alleges as follows:

<strong>INTRODUCTION</strong>

       1.     In this action, Plaintiff complains that Defendants Revlon, Inc. and Revlon Consumer Products Corporation (collectively "Revlon" or "Defendants") should be required to contribute towards the cost of past and future investigation, removal, and remedial activities (together "Environmental Response") to address soil, groundwater, and soil vapor contamination (the "Contamination") associated with chlorinated fluorocarbons dichlorodifluoromethane (a/k/a Freon 12), 1, 2-dichlorotetrafluoroethane (a/k/a Freon 114), trichlorofluoromethane (a/k/a Freon 11), trichlorotrifluoroethane (a/k/a Freon 113),  and other substances deemed to be hazardous (the "Hazardous Substances") by the State of New York and by the United States Environmental Protection Agency ("EPA") contained in waste products disposed by Revlon (the "Revlon Waste") in and around the property located at 109-125 Marbledale Road in the Village of Tuckahoe ("Village"), County of Westchester, and State of New York (the "Property").

2.     The Village operated a landfill at the Property, known as the Former Marble Quarry Landfill, from approximately 1958 to 1978 ("Landfill").

3.     Defendants and/or their predecessors, successors, and assigns, operated and/or arranged for disposal (the "Disposal") of Revlon Waste containing Hazardous Substances in the Landfill by contract, agreement, or otherwise resulting in the Contamination.

4.     The Revlon Waste disposed at the Landfill included, but was not limited to consumer products, including but not limited to numerous cans of Mitchum antiperspirant, deodorant, inhalers, and other products containing Freon 12, Freon 114, Freon 11, Freon 113, and other Hazardous Substances.

5.     The product containers constituting the Revlon Waste bore the name of predecessor, successor or assign corporate entities of Revlon.

6.     The Contamination caused by the Disposal of the Revlon Waste caused most of Plaintiff's costs to investigate and remediate the Property.

7.     Plaintiff brings a claim for contribution under § 113(f), or in the alternative § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a) and 9613(f), inter alia, to recover its environmental response costs for investigating and remediating the Contamination at the Property.

8.     Plaintiff also brings a claim under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B) against Revlon, as a generator of the Revlon Waste and/or an operator of the Landfill at the time of the Disposal, for the Disposal of Revlon Waste, which continues to present an imminent and substantial endangerment to health or the environment since the Contamination associated with the Revlon Waste could not all be removed from the Property,

and the associated soil vapor Contamination resulting from the Disposal of the Revlon Waste at the Property must continue to be managed through engineering controls in perpetuity.

9.     Plaintiff also brings claims under state law, common law, and equitable theories.

10.     As a result, for the purposes of facilitating a final remedial action, Plaintiff seeks fair and equitable response costs, property damages, injunctive relief, a declaratory judgment, and other relief due to the Contamination resulting from the operation of and/or arrangement for Disposal by Defendants and/or their predecessors, successors, and assigns of the Revlon Waste.

## PARTIES

11.     Bilwin Development Affiliates LLC is a New York State limited liability company with a designated service address of 365 White Plains Road, Eastchester, New York 10709.

12.     Revlon Consumer Products Corporation is a Delaware corporation doing business in the State of New York with a principal executive office located at 1 New York Plaza, New York, New York 10004.

13.     Revlon, Inc. is a Delaware corporation doing business in the State of New York with a principal executive office located at 1 New York Plaza, New York, New York 10004.

## THE PROPERTY

14.     The Property was historically used as an industrial marble quarry.

15.     The marble quarry extended beyond the footprint of the Property.

16.     The approximately 3.45 acre "Property" consists of two adjacent tax parcels (Tax Parcel## 35-1-1.A-E and 35-1-1.A-T) with a collective property address of 109-125 Marbledale Road, Tuckahoe, New York. *See* Tax Parcel Map of the Property attached as **Exhibit "A."**

17.     In or about 1958, the quarry, which included the Property, closed and the Property owner Woodbine Holding Co., Inc. entered into a long term lease agreement with the Village

allowing the Village to operate the former quarry as a municipal landfill from 1958 to at least 1973.  *See* **Exhibit "B"** Lease.

18.     Upon information and belief the Village operated the Landfill from 1958 when the lease was signed until 1978, when Ardmar Realty Company (later known as Ardmar Realty Co., LLC and hereinafter "Ardmar") purchased the Property, paved it, and began using it for auto parking, and subsequently as an auto repair, car storage, and auto sales and service facility.

19.     From 1978 to 1994, the Property was used as a parking lot, and temporarily for auto repair by Ardmar, however, since about 1994, the Property remained vacant and abandoned.

20.     The only structures on the Property from 1994 to 2014 were two small, abandoned storage/office trailers.

21.     Plaintiff became interested in acquiring the Property in late 2012 / early 2013 in order to develop a Marriott hotel and restaurant.

22.     At that time, Plaintiff was provided with a copy of a 1999 signed statement from the Village Highway Commissioner who stated that he observed that only ashes, empty containers, paper, stone, leaves and dirt were placed in the Landfill ("Village Statement").  *See* the Village Statement attached as **Exhibit "C."**

23.     In reliance upon the Village Statement, Plaintiff began to spend money to satisfy environmental due diligence requirements before acquiring the Property, and hired environmental consulting firm HydroEnvironmental Solutions, Inc. ("HES").

24.     Due to the historic industrial use of the property, including the Landfill and automobile repair uses, a Phase II Environmental Site Assessment ("ESA") was performed by HES first on the southern, more accessible portion of the Property to determine if contamination was present from these already known recognized environmental conditions (RECs).

4

25.     The results of the ESA were summarized in a Phase II Environmental Site Assessment Report dated June 13, 2013 ("June 2013 Phase II Report"), which revealed contaminants believed to be related to the known RECs, including semi-volatile organic chemicals and metals that could have resulted from ash fill and volatile organic compounds that could have resulted from the prior automobile repair use.

26.     Subsequent to the June 2013 Phase II ESA, Plaintiff obtained a Phase I ESA for the Property dated September 3, 2013 ("September 2013 Phase I Report") to satisfy CERCLA's *bona fide* prospective purchaser defense pursuant to CERCLA § 101(40), 42 U.S.C.A. § 9601(40) and for purposes of submitting a New York State Brownfield Cleanup Program ("BCP") Application before acquiring the Property.

27.     Between October and December 2013, a Supplemental Phase II ESA was performed by HES to investigate the northern portion of the Property, which was not previously included in the June 2013 Phase II ESA, and was documented in a Supplemental Phase II ESA Report dated January 2014 ("January 2014 Supplemental Phase II ESA Report").

28.     Therefore, the Plaintiff satisfied the all appropriate inquiry requirements before submitting its BCP Application, on January 27, 2014, to the New York State Department of Environmental Conservation ("NYSDEC") to enter the Property into the BCP.

29.     The NYSDEC issued a Letter of Incomplete Application to the Plaintiff on February 11, 2014 and on February 21, 2014 a revised BCP Application satisfying all of the NYSDEC comments was resubmitted.

30.     All of the environmental reports submitted with the BCP Application and the application itself clarified that the Plaintiff was a prospective purchaser with no role in the Contamination of the Site.

31.     On April 30, 2014, Plaintiff entered into a Brownfield Cleanup Agreement ("BCA") with the NYSDEC, which deemed the Plaintiff an eligible "Volunteer" as defined in New York State Environmental Conservation Law ("ECL")  Section 1045(b)(1)[1] and the Property eligible for participation in the BCP.  *See* the BCA attached as **Exhibit "D."**

### THE REMEDIAL INVESTIGATION

32.     The Plaintiff, as stated in the BCP Application documents and response to NYSDEC comments, planned to remediate the Property through a Track 4 remedial program, pursuant to ECL §27-1415(4), consisting of a source area or "hot spot" removal remedy and construction of a remedial cover system or "cap" of the Landfill meeting commercial use standards by the construction of a multi-story hotel and restaurant (the "Project").

33.     At the time the BCA was executed, Plaintiff anticipated that the Project would be completed by May 2015.

34.     While there was some volatile organic compound ("VOC") contamination in the groundwater, believed at the time to be the result of former auto repair operations, the extent of the soil vapor Contamination was not known despite the extensive Phase II ESA and supplemental environmental investigation work performed by HES.

35.     Plaintiff acquired the Property from Ardmar on June 17, 2014 and the BCA was amended on June 28, 2016 to change the Property ownership information.  *See* **Exhibit "E,"** BCA Amendment and Deed.

---

[1]     A "Volunteer" is defined in ECL §27-1405(b)(1) as "an applicant other than a participant, including without limitation a person whose liability arises solely as a result of such person's ownership or operation of or involvement with the site subsequent to the disposal or discharge of contaminants, provided however, such person exercises appropriate care with respect to contamination found at the facility by taking reasonable steps to:
        (i) stop any continuing release;
        (ii) prevent any threatened future release; and
        (iii) prevent or limit human, environmental, or natural resource exposure to any previously released contamination."

36.     After the Property was admitted into the BCP, the NYSDEC and the New York State Department of Health ("NYSDOH") required a Remedial Investigation ("RI") of the Property, which included a number of additional subsurface investigations.

37.     HES performed the RI during most of 2015 in accordance with an approved Remedial Investigation Work Plan ("RIWP") dated November 7, 2014 and approved by the NYSDEC on February 6, 2015.

38.     The results of the RI were documented in a Remedial Investigation Report ("RIR"), dated January 15, 2016, prepared by HES.

39.     HES then prepared a work plan called the Remedial Action Work Plan ("RAWP"), which was approved in July 2016.  *See* Final RAWP (narrative only), attached hereto as **Exhibit "F**."

40.     The RI analytical results summarized in the RAWP described the Contamination in the surface soil/fill, subsurface soil, groundwater and soil vapor.

41.     The surface samples collected from locations inside the Property boundaries at depths between 0 and 0.17 feet below grade identified the presence of semi-volatile organic compounds ("SVOCs"), specifically polycyclic aromatic hydrocarbons ("PAHs"), and metals at concentrations that exceeded the NYSDEC's Commercial Soil Cleanup Objectives ("CSCOs") codified at 6 N.Y.C.R.R. Part 375-6.8(a).  *See* Exhibit F, §2.1.1.

42.     These contaminants were associated with the ash disposed on the Property in the historic fill.

43.     The analytical results of the subsurface soil collected from locations inside the Property boundaries identified the presence of petroleum-related VOCs, SVOCs, polychlorinated biphenyls ("PCBs"), and metals at concentrations above the CSCOs.  *See* Exhibit F, §2.1.2.

44. Soil vapor samples collected from inside the Property boundaries detected VOCs, including those associated with solvents and various Freons, including 1,1,2,2-tetrachloroethane (a/k/a R-130), 1,1-dichloroethene and dichlorodifluoromethane (Freon 12); these vapor detections were numerous across the Property, necessitating mitigation of the potential for vapor intrusion. However, the origin of these substances was still unknown since the Village has indicated that the Landfill was only used for ashes, paper, dirt, stone, and yard waste. *See* Exhibit C and Exhibit F, §2.2.

45. Groundwater samples collected from inside the Property boundaries contained VOCs, SVOCs, and pesticides above NYSDEC Ambient Water Quality Standards ("AWQS"), but again the source of this groundwater contamination was not known. *See* Exhibit F, §2.3.

46. NYSDEC and NYSDOH determined the Property posed a significant threat to human health and the environment due primarily to the very high concentrations of Freon 12, Freon 114, Freon 11, and Freon 113 in soil vapor samples collected on-site closest to off-site buildings at the eastern Property boundary and migrating off-site. *See* October 28, 2015 DEC Letter in **Exhibit "G"** hereinafter referred to as the "Significant Threat Letter," the March 2016 Fact Sheet, attached hereto as **Exhibit "H,"** and July 2016 Decision Document prepared by NYSDOH and NYSDEC and issued to the public, attached hereto as **Exhibit "I"**.

47. The Decision Document stated that only 1,264 cubic yards of waste was projected to require off-site disposal. *See* Exhibit I.

48. The RAWP was approved on July 18, 2016.

49. Part of the approved remedy in the RAWP included design and construction of sub-slab depressurization systems (SSDS) in on-site buildings, and a site-wide soil vapor extraction (SVE) system to remove volatile organic compound (VOC) vapors from subsurface soil.

50.     However, despite RAWP approval, which typically allows the remediation to commence, the NYSDEC and NYSDOH required a Supplemental Environmental Investigation (SEI), performed from September through December 2016, to more fully characterize the nature and extent of Contamination at the Property, evaluate the extent and composition of the fill material, and the hydrogeologic characteristics (i.e., groundwater flow direction, hydraulic gradient in bedrock and overburden aquifers beneath the site) of the Property and groundwater quality.

51.     The SEI included the following environmental work:

- Installation of forty-nine (49) soil pre-characterization borings: five (5) deep borings and forty-four (44) shallow borings;
- Collection and analysis of fifty-five (55) subsurface soil samples;
- Installation and sampling of six (6) monitoring wells, three shallow overburden wells and three deep bedrock wells; and
- Installation and sampling of four (4) Soil Vapor Extraction (SVE) wells and SVE Pilot Testing.

52.     In addition to oversight by the state agencies, the Village was under pressure from members of the community, who had demanded multiple public meetings to review the ongoing investigation results and were convinced they were all being exposed to soil vapor contamination at great distances from the Property.

53.     Plaintiff had to pay, at great expense, for the Village to have consultants and counsel overseeing all of the work done at the Property due to the heightened level of public concerns related to soil vapor intrusion in the off-site properties.

54.     As a result of the utter fear in the community that remediation through source removal was going to cause exposure, the Village's consultant required Plaintiff and its consultant HES to prepare a scope of work for the planned remedial work.  The first scope of work was not approved until February 17, 2017.  *See* **Exhibit "J."**

## THE REMEDIATION AND THE REVLON WASTE

55.    Finally, after many years of investigation, the actual remediation work commenced in mid-February 2017.

56.    Between February 15 – February 17, 2017, during the Plaintiff's newly commenced remediation work on the Property in compliance with the requirements of the BCP, Plaintiff's consultants uncovered the first area of Revlon Waste on the Property, including but not limited to, hundreds of crushed and intact Mitchum antiperspirant and inhaler aerosol cans (the "Cans"). *See* Logbook and Photos, attached hereto as **Exhibit "K**."

57.    Upon information and belief, Mitchum is a brand of Defendants' and/or Defendants' predecessor.

58.    Upon information and belief, certain Freons were present in the Defendants' and/or Defendants' predecessor's products during the time period the Landfill was in operation from 1958-1978.

59.    The Cans were found in the same location where a prior subsurface soil vapor investigation found high levels of Freon-12, Freon-114, Freon-11, and Freon-113 close to the off-site building at 125 Marbledale, where the NYSDEC and NYSDOH had already determined the potential existed for vapor intrusion impacts into this and other off-site buildings. *See* Exhibits G-I.

60.    On or about February 23, 2017, Plaintiff's counsel sent Defendants a Notice of Intent to Pursue Federal Civil Action under RCRA, and Seven Day Notice of Right to Inspect and Sample Hazardous Substances (the "Notice"), informing Defendants that this Contamination and Disposal may have caused an imminent and substantial endangerment to health or the environment

at the Property.  *See* Notice Letter with Mailing Receipts, attached hereto as **Exhibit "L**", including the DOH Significant Threat Letter.

61.     On or about March 1, 2017, Defendants' counsel responded to the Notice, where Revlon expressed interest in viewing the evidence at the Property, but requested more time to do so.  *See* March 1, 2017 Letter, attached hereto as **Exhibit "M**."

62.     On or about March 10, 2017, Revlon's environmental consultant visited the Property, but upon information and belief, despite being given unrestricted access to the Property to conduct whatever investigation or sampling it deemed appropriate, Revlon's consultants left without taking any samples and opted instead for field observations and collecting photoionization detector readings.

63.     On or about March 15, 2017, Defendants' counsel sent a supplemental response letter to the Notice, where counsel contested Plaintiff's assertion that the Property may pose an imminent and substantial endangerment to health or the environment.  *See* March 15, 2017 Letter, attached hereto as **Exhibit "N**."

64.     On or about March 22, 2017, Plaintiff's counsel sent a reply letter to Defendants' counsel, requesting that Revlon pay for the disposal of the Cans at the Property and notifying Defendants' counsel of the finding of an additional area of Cans on the Property.  *See* March 22, 2017 Letter, attached hereto as **Exhibit "O**."

65.     On or about March 24, 2017, Defendants' counsel sent a reply letter to Plaintiff's counsel, refusing to pay for the disposal costs of the Cans and requesting all construction activities at the Property to cease.  *See* March 24, 2017 Letter, attached hereto as **Exhibit "P**."

66.     On March 7, 2017, intact Cans that were excavated were sent by Plaintiff to a laboratory for sampling and the contents of the Cans were consistent with the Freon Contamination

found in the Landfill's groundwater and soil vapor.  *See* **Exhibit "Q"** March 2017 Laboratory Data.

67.     On or about April 20, 2017, after giving Revlon's consultant the opportunity to take split samples in a newly discovered area of Cans and associated soil, split samples were  collected and the results revealed Freon Contamination in soil in the immediate vicinity of the Cans.  *See* **Exhibit "R"** April 2017 Laboratory Data.

68.     After the Cans were discovered and several opportunities for sampling were provided to the Defendants, including on July 27, 2017 and September 29, 2017, the Cans were excavated and placed into containers prior to planned off-site disposal.

69.     However, because these Cans contained chlorinated fluorocarbons (CFCs) that were banned from production by the Toxic Substance Control Act (TSCA), disposal of the Cans became extremely difficult since disposal facilities were unsure whether they were permitted to accept this type of banned waste pursuant to their permits.

70.     Additional sampling of the contents of intact Cans was performed in August and September 2017 required by waste disposal facilities and by a different lab.  *See* **Exhibit "S"** August – September 2017 Laboratory Data.

71.     However, it was not until the following April 2018 that a disposal facility finally agreed to accept the Cans for disposal as hazardous waste.  *See* **Exhibit "T"** Waste Disposal Documents.

72.     Plaintiff could not cease construction activities, as Revlon requested, since doing so would pose a significant threat to human health and the environment as well as an imminent and substantial endangerment to health or the environment.

73.     In fact, just recently, the NYSDEC issued an essential construction letter to the Plaintiff to continue the remediation because this Property poses a significant threat to human health and is engaged in active remediation.  *See* **Exhibit "U."**

74.     While the remediation of the Property, is still not complete to the point of receiving a Certificate of Completion ("COC") from the NYSDEC and NYSDOH, receipt of a COC is anticipated this calendar year after a significant expenditure of money to address the Contamination caused by the Revlon Waste.

75.     Revlon has not made any effort to assist in the disposal or remediation costs of the excavated Cans found on the Property, despite being given the opportunity to do so.

76.     The Contamination continues to pose a substantial and costly risk to Plaintiff, the Property, and the surrounding community because it is not feasible to physically remove all of the Freon Contamination in the groundwater despite the physical removal and costly off-site disposal of the Cans.  Consequently, this prompted the need for soil vapor mitigation in perpetuity through engineering controls including a subslab depressurization system (SSDS) in each of the two buildings on the Property, and a site-wide SVE system, which will require ongoing maintenance, monitoring and possibly future additional remediation, which are enforceable by the NYSDEC through an environmental easement that has been recorded and runs in perpetuity with the Property. *See* **Exhibit "V."**

77.     Soil vapor contamination causes an imminent and substantial endangerment even if it is being remediated because to the extent the party performing the ongoing operations of the engineering controls designed to address the vapors can no longer continue to maintain and pay for such systems, the imminent and substantial endangerment remains present.

**DAMAGE TO PLAINTIFF**

78.     Plaintiff has been and will continue to be damaged by incurring response costs for the Environmental Response to the Contamination caused by Defendants, which have caused releases (the "Releases") of Hazardous Substances at the Property.

79.     As a direct, proximate, and natural consequence of the Disposal and Contamination, and the failure of the Defendants to promptly and adequately remediate the Contamination, Plaintiff has incurred, and will need to incur in the future, Environmental Response costs related to costly removal and remedial measures.

80.     Defendants should be responsible for the Disposal and Contamination for which they are jointly and severally liable, or in the alternative should be required to pay their equitable share.

## PROCEDURAL ISSUES

81.     Plaintiff has no adequate remedy at law, and no previous application has been made for the relief sought in this action.

82.     This Court has subject matter jurisdiction over the First, Second and Third Causes of Action of this Complaint, pursuant to CERCLA §§ 107 and 113(b) (42 U.S.C. §§ 9607, 9613(b)), 28 U.S.C. § 1331 and RCRA § 7002(A)(1)(B) (42 U.S.C. § 6972(A)(1)(B)).

83.     This Court has supplemental jurisdiction over the state law claims in the other Causes of Action of this Complaint pursuant to 28 U.S.C. § 1367, since they arise out of a common nucleus of facts.

84.     Venue is proper in this federal District Court pursuant to CERCLA §§ 107, 113(b) (42 U.S.C. §§ 9607, 9613(b)), and RCRA § 7002(A)(1)(B) (42 U.S.C. § 6972(A)(1)(B)), because the Releases occurred and the Contamination is located within the Southern District of New York,

and pursuant to 28 U.S.C. § 1391, because the real property which is the subject of this action is located, and the events related to the claims occurred, within the Southern District of New York.

85.    In addition, the Declaratory Judgements Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief in this matter.

**AS AND FOR A FIRST CAUSE OF ACTION**
**FOR COST RECOVERY UNDER CERCLA § 107,**
**PLAINTIFF ALLEGES AS FOLLOWS:**

86.    Plaintiff repeats and realleges the allegations of paragraphs "1" through "85" of this Complaint, as if set forth in this paragraph at length.

87.    The Property is a "facility," as defined in CERCLA §101(9) (42 U.S.C. §9601(9)).

88.    Defendants and/or Defendants' predecessors are Operators as defined by CERCLA §101(20) (42 U.S.C. §9601(20)), of the Property, at the time of Disposal of the Contaminants.

89.    Defendants and/or Defendants' predecessors are persons who arranged for the Disposal of Hazardous Substances, as described in CERCLA § 107(a)(3), at the Property.

90.    Upon information and belief, Defendants and/or Defendants' agents are persons who transported Hazardous Substances, as described in CERCLA § 107(a)(3), to the Property.

91.    The Hazardous Substances are "hazardous substances" as defined by CERCLA §101(14) (42 U.S.C. §9601(14)).

92.    Pursuant to CERCLA §107(a) (42 U.S.C. §9607(a)), Defendants and/or Defendants' predecessors are persons who are strictly liable and responsible for investigation, cleanup, remediation, and removal of the Contamination, and Plaintiff's associated past and future response costs.

93.    Plaintiff has incurred response costs as a result of the Contamination.

94.     All response costs incurred by Plaintiff in connection with the Contamination have been consistent with the National Contingency Plan, and are recoverable pursuant to CERCLA §107(a) (42 U.S.C. §9607(a)).

95.     Accordingly, Defendants are strictly, jointly and severally liable under CERCLA §107(a), 42 U.S.C. §9607(a) for all response costs incurred by the Plaintiff, and all response costs necessary in the future, to remediate the Property and any potential off-site impacts.

96.     This Court should direct Defendants to pay the response costs incurred by Plaintiff, and declare that they are liable for Plaintiff's future response costs for the Property and any potential off-site impacts.

**AS AND FOR A SECOND CAUSE OF ACTION
FOR CONTRIBUTION UNDER CERCLA,
PLAINTIFF ALLEGES AS FOLLOWS:**

97.     Plaintiff repeats and realleges the allegations of paragraphs "1" through "96" of this Complaint, as if set forth in this paragraph at length.

98.     Pursuant to CERCLA, including CERCLA § 113(f)(1) (42 U.S.C. § 9613(f)(1)), CERCLA § 107(a) (42 U.S.C. § 9607(a)), and/or otherwise, Defendants must contribute their equitable share of the response costs incurred by Plaintiff to investigate and remediate the Contamination at and emanating from the Property.

99.     This Court should direct Defendants to pay their equitable shares of response costs incurred by Plaintiff, and declare that they are liable for their equitable share of Plaintiff's future response costs for the Property and any potential off-site impacts.

**AS AND FOR A THIRD CAUSE OF ACTION**
**PURSUANT TO RCRA § 7002(A)(1)(B),**
**PLAINTIFF ALLEGES AS FOLLOWS**

100.     Plaintiff repeats and realleges the allegations of paragraphs "1" through "99" of this Complaint, as if set forth in this paragraph at length.

101.     The Contamination presents an imminent and substantial endangerment to human health and the environment.

102.     On February 23, 2017, Plaintiff issued formal notices of intent to file suit under RCRA to Defendants via registered mail, return receipt requested, with copies to the Administrator of the USEPA, the Regional Administrator for USEPA Region 2, and the NYSDEC, among others. *See* Exhibit "L.".

103.     The citizen suit provision of RCRA allows any "person" to commence an action "against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid ...waste which may present an imminent and substantial endangerment to health or the environment…." 42 U.S.C. § 6972(a)(1)(B).

104.     The Landfill is a disposal facility pursuant to 42 U.S.C. § 6972(a)(1)(B).

105.     Pursuant to 42 U.S.C. § 6903(15), Plaintiff is a "person" who may bring citizen suits pursuant to the provisions of RCRA, 42 U.S.C. § 6972.

106.     Pursuant to 42 U.S.C. § 6903(15), Defendants are each a "person" and subject to the citizen suit provisions of RCRA, 42 U.S.C. § 6972.

107.    Solid waste is defined as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities."  42 U.S.C. §6903(27).

108.    The Revlon Waste constitutes a solid waste.

109.    Defendants were a generator of the Revlon Waste.

110.    Upon information and belief, Defendants were a past operator of the Landfill.

111.    The Cans have released dangerous and noxious chemicals, including Freons, ozone-depleting chemicals, VOCs and other noxious chemicals and Hazardous Substances that continue to contaminate the Property.

112.    The continuing presence of these Contaminants including Hazardous Substances at the Property present or may present an imminent and substantial endangerment to health or the environment, including a continuing threat to the health of the surrounding community and the buildings located on and near the Property, even though the Cans were removed, because the Freon contaminated groundwater and soil vapor persists at the Site.

113.    Despite adequate remediation or corrective action being implemented at the Property to enable the on-Site commercial uses to be occupied, Plaintiff and the community are still impacted by presence of the Contamination, which require long term management and maintenance.

114.    The only remediation or corrective action that has taken place at the Property was done at the expense of Plaintiff, despite numerous requests for payment from the Defendants.

18

115.    This Court should issue an injunction, pursuant to 42 U.S.C. § 6972(a), directing Defendants to take over the costs to continue to abate this imminent and substantial endangerment in perpetuity.

116.    This Court should also award Plaintiff the costs of this litigation (including reasonable attorney and expert witness fees), pursuant to 42 U.S.C. § 6972(e).

**AS AND FOR A FOURTH CAUSE OF ACTION
FOR NEGLIGENCE,
PLAINTIFF ALLEGES AS FOLLOWS:**

117.    Plaintiff repeats and realleges the allegations of paragraphs "1" through "116" of this Complaint, as if set forth in this paragraph at length.

118.    Defendants owed a duty of care to Plaintiff with regard to their operation of the Property and/or arrangement for Disposal of the Contamination originating from the Property.

119.    Defendants caused the Releases and Contamination, and should have promptly and adequately effected an immediate investigation and cleanup once provided the Notice of the Contamination.

120.    Defendants (including their officers, agents, servants, and/or employees) acted unreasonably and negligently in failing to prevent, or in causing the Releases and Contamination, failing to promptly and adequately report the Contamination to NYSDEC, USEPA and Plaintiff, and/or failing to promptly and adequately investigate and remediate the Contamination, and those acts or omissions were the direct and proximate cause of the continued existence and spread of the Contamination, and damages to Plaintiff.

121.    Defendants, by reason of their negligence, are liable for all of the damages to Plaintiff proximately caused by the Contamination, and investigation, cleanup and removal of the Contamination at and emanating from the Property.

## AS AND FOR A FIFTH CAUSE OF ACTION
## FOR PUBLIC NUISANCE,
## PLAINTIFF ALLEGES AS FOLLOWS:

122.     Plaintiff repeats and realleges the allegations of paragraphs "1" through "121" of this Complaint, as if set forth in this paragraph at length.

123.     The Releases and resulting Contamination are a public nuisance, because they interfere with rights common to all, including groundwater, air, and soil.

124.     Defendants caused the Releases and Contamination, and/or having had a reasonable opportunity to abate the nuisance by investigating and remediating the Contamination, failed to do so in a reasonably prompt and effective manner, and/or failed to promptly and adequately report the Releases and Contamination to NYSDEC, USEPA, and Plaintiff.

125.     By causing the Releases and Contamination, and/or failing to promptly and adequately report and investigate and remediate the Releases and Contamination, Defendants (including their officers, agents, servants, and/or employees), have interfered with rights common to all, including air, groundwater, and soil, or have assumed liability for that interference.

126.     Plaintiff has sustained special damages from this public nuisance.

127.     Defendants, by reason of this public nuisance, are liable for all of the damages to Plaintiff proximately caused by the Contamination, and investigation, cleanup and removal of the Contamination at the Property.

## AS AND FOR A SIXTH CAUSE OF ACTION
## FOR RESTITUTION,
## PLAINTIFF ALLEGES AS FOLLOWS:

128.     Plaintiff repeats and realleges the allegations of paragraphs "1" through "127" of this Complaint, as if set forth in this paragraph at length.

129.     The Contamination poses a threat to the environment and/or public health.

130.    Plaintiff's actions in responding to the Contamination, which has been maintained and allowed to persist by Defendants in violation of law, were immediately necessary to satisfy the requirements of public health.

131.    It would be against equity and good conscience to permit Defendants to pass the burden of cleaning up the Contamination to Plaintiff, and for Defendants to have had the benefit of enjoyment of the use of Property for the Disposal of Hazardous Substances free of full responsibility for investigation, remediation, cleanup, and removal of, and response to, the Contamination at and surrounding the Property.

132.    Therefore, Defendants should make restitution to Plaintiff for some or all off their expenses, costs, and damages for Environmental Response related to and surrounding the Property, to the extent not recoverable under CERCLA.

**AS AND FOR AN SEVENTH CAUSE OF ACTION
FOR CONTRIBUTION OR INDEMNIFICATION,
PLAINTIFF ALLEGES AS FOLLOWS:**

133.    Plaintiff repeats and realleges the allegations of paragraphs "1" through "132" of this Complaint, as if set forth in this paragraph at length.

134.    Defendants, including their officers, agents, servants, employees, and/or predecessors, had a non-delegable duty to prevent, clean up or ensure against the Contamination.

135.    Some or all of the Contamination is classified as hazardous waste, pursuant to Environmental Conservation Law ("ECL") Article 27, and hazardous substances, pursuant to ECL Article 37.

136.    As a result of the breach of this duty by Defendants, including their officers, agents, servants, employees, and/or predecessors, Defendants are responsible for Plaintiff's past and future expenses and damages in investigation, remediation, cleanup, and removal of, and response to, the

Contamination at and surrounding the Property, and as a result, Defendants should, in equity, indemnify Plaintiff for some or all of its expenses, costs, and damages, to the extent not recoverable under CERCLA.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## FOR A DECLARATORY JUDGMENT,
## PLAINTIFF ALLEGES AS FOLLOWS:

137.   Plaintiff repeats and realleges the allegations of paragraphs "1" through "136" of this Complaint, as if set forth in this paragraph at length.

138.   The Declaratory Judgements Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief in this matter.

139.   Plaintiff and Defendants have an actual controversy sufficient to allow this Court to declare their rights.

140.   As set forth above Defendants are liable for their equitable share of cleanup of the Property.

141.   Accordingly, Plaintiff requests that the Court issue a Declaratory Judgment that Defendants are liable for their equitable share of the costs of investigation and remediation of the Property.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.     Declaring that Defendants are jointly and severally responsible, or alternatively liable for their equitable share, of the costs associated with of the Property the Environmental Response to the Contamination at and emanating from the Property and requiring them to pay those costs to Plaintiff.

b.    Declaring that Defendants are responsible for Plaintiff's future damages and Environmental Response costs and to fully investigate and remediate the Property and any potential off-site properties affected by the Contamination at the Property.

c.    Awarding Plaintiff their damages and response costs, with interest.

d.    Granting a permanent injunction ordering Defendants to further investigate the Contamination at and emanating from the Property, and to completely remove and remediate all of the Contaminants at and emanating from the Property.

e.    Awarding plaintiff their attorneys' fees, experts' fees and other costs and expenses.

f.    Awarding such other damages and further relief as this Court deems just, proper and equitable.

Dated: Rochester, New York          s/Linda R. Shaw
       April 17, 2020               **KNAUF SHAW LLP**
                                    Attorneys for Plaintiffs
                                    Linda R. Shaw, Esq. (LS8189),
                                    Dwight Kanyuck, Esq. (DK1973), and
                                    Jonathan Tantillo, Esq. (JT5297), of counsel.
                                    1400 Crossroads Building
                                    2 State Street
                                    Rochester, New York 14614
                                    Tel.: (585) 546-8430
                                    lshaw@nyenvlaw.com
                                    dkanyuck@nyenvlaw.com
                                    jtantillo@nyenvlaw.com

## JURY DEMAND

Plaintiff demands trial by jury, pursuant to F.R.C.P. Rule 38(b).

Dated: Rochester, New York
April 17, 2020

s/Linda R. Shaw

**KNAUF SHAW LLP**
Attorneys for Plaintiffs
Linda R. Shaw, Esq.
1400 Crossroads Building
2 State Street
Rochester, New York 14614
Tel.: (585) 546-8430
lshaw@nyenvlaw.com